IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| Pauline EVERINGHAM<br><br>          Plaintiff,<br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>          Defendant. | Civil No. 17-12249 (RBK)<br><br>**OPINION** |

**KUGLER**, United States District Judge:

**THIS MATTER** comes before the Court on the appeal of Plaintiff Pauline Everingham (Doc. No. 1) for review of the Administrative Law Judge's ("ALJ") decision denying Plaintiff's claims for disability insurance benefits. Because substantial evidence supports the ALJ's finding that Plaintiff was not disabled as defined in the Social Security Act on or after August 20, 2013, the Court **AFFIRMS** the ALJ's decision denying benefits.

**I.    BACKGROUND**[1]

    **A. Procedural and Plaintiff's History**

Plaintiff Pauline Everingham is a forty-seven-year-old woman who lives in Woodbury, New Jersey. R. 15, 36. She is five feet, four inches tall, weighs 204 pounds, and has a Full-Scale IQ of 77. R. 37, 48. She also has three children, ages 12, 13, and 19. R. 15. While she

---

[1] Because the record is voluminous, the Court sets forth only those facts necessary for context and most relevant to the instant motion. "R." in citations refers to pages in the administrative record. Additional facts are set forth as needed in the "discussion" section below.

has not worked outside of the home in more than twenty years, she recently earned a GED and can read, drive, cook, and do laundry. R. 15, 38, 42.

On August 20, 2013, Plaintiff filed an application for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act. R. 183. The application was denied on initial consideration and again on reconsideration. R. 108, 116. Plaintiff then filed a request for hearing, which was held on August 29, 2016 before an Administrative Law Judge ("ALJ"). The ALJ issued a decision on September 16, 2016, determining that Plaintiff was not disabled within the meaning of the Social Security Act. R. 7.

Plaintiff then filed a request for review of the ALJ decision to the Appeals Council. Plaintiff submitted additional evidence: medical records from Dr. Michael Rogers, dated August 15, 2017, and medical records from Inspira Medical Center Woodbury, dated April 13, 2016. The Appeals Council found that the additional evidence did not show a reasonable probability of changing the ALJ's decision and denied the request for review on October 31, 2017. R. 1. On November 30, 2017, Plaintiff filed the instant complaint in this Court. Compl. [Doc. No. 1].

**B. Medical Evidence**

Plaintiff receives medical treatment for anxiety and depression. She consults with a psychologist every other month and a therapist every other week. R. 42. She takes several medications, including Zoloft, Wellbutrin, and Vistaril, and uses an inhaler for her asthma. R. 41, 57. She has the following severe impairments: obesity, asthma, a learning disorder, a major depressive disorder, and a generalized anxiety disorder. She also suffers from irritable bowel syndrome, arthralgia, and GERD. R. 12–3. Below are summaries of relevant medical history and evaluations.

1. *New Point Behavioral Healthcare*

Plaintiff began treatment at New Point in 2013. Plaintiff complained of anxiety, depression, and panic attacks. New Point assessed her as having major depressive disorder, generalized anxiety, and learning disorders. She also experienced intermittent neck, back, and joint pain. Plaintiff revealed a history of family abuse and her tendency to hoard items in her home. R. 440. New Point listed her with an initial GAF score of 51.

The record indicates that the Plaintiff's mental state improved with treatment. Most notably, she started on medications and psychotherapy. Plaintiff began to report better feelings and moods. By November 2013, Plaintiff described her mood as "good." R. 393. Despite several months of not taking her prescribed Zoloft, Plaintiff improved further upon taking the medication. For example, she reported less anxiety and a stable mood. New Point Behavioral Health recorded an increased GAF score of 58, up from 51. In the next year, this score rose to 59.

2. *Dr. Alan Gordon*

Dr. Gordon examined the Plaintiff in 2009, three years before the application for SSI benefits. R. 366. The report noted Plaintiff's disabilities and disorders. These included Dysthymia, a general anxiety disorder, Attention Deficit Disorder, borderline intellectual functioning, and a reading disorder. R. 375. In the evaluation, Dr. Gordon showed how Plaintiff performed in a battery of tests. These tests placed Plaintiff in the sixth-eighth grade level for basic reading and arithmetic skills. In addition, Dr. Gordon found that Plaintiff had a full-scale IQ of 77, which is borderline. R. 369. Plaintiff's IQ equivalence, however, was much higher than the results of her tests indicted. R. 370.

Importantly, this report predated Plaintiff's application for SSI benefits. As such, the evaluation failed to consider Plaintiff's medications and treatment within the window of her SSI application. Specifically, the Dr. Gordon's report does not include Plaintiff's recent psychiatric treatment from 2013 onward; nor does it include Plaintiff's improved mood after taking Zoloft in 2015. R. 403.

### 3. Dr. Mintzer

Dr. Mintzer provided a consultative exam of the Plaintiff on November 12, 2013. In his evaluation, he reviewed the Plaintiff's medical history, including Dr. Gordon's evaluation which included a full-scale IQ of 77. In addition, Dr. Mintzer noted several of Plaintiff's severe disorders: Attention Deficit Hyperactivity Disorder, an unspecified learning disorder, Obsessive-Compulsive Disorder, and a panic disorder. He further noted Plaintiff's asthma and joint pain. Similar to Dr. Gordon's report, this evaluation predated Plaintiff's mental health treatment. The evaluation therefore does not include Plaintiff's recent therapy sessions or taking of Zoloft. In addition, Dr. Mintzer did not provide an opinion as to the Plaintiff's functional abilities and limitations for mental work activities. Instead, he more generally noted Plaintiff's overall limitations to be moderate to severe in degree.

### 4. State Psychologists

The Department of Disability Services ("DDS") conducted a medical evaluation and determined that the Plaintiff had the capacity to perform work activities at a light exertional level. The DDS psychologist considered all relevant medical history, medications, and

subjective complaints. The report noted that Plaintiff does most of the cleaning and cooking in her home. R. 75. The report further found that she volunteers, serves on the PTA, and shops.

Tests also found that Plaintiff could occasionally lift or carry up to twenty pounds and sit for about six hours in an eight-hour work day. R. 80. The report concluded that Plaintiff could adapt to a routine workplace setting and can sustain the mental demands of simple tasks. Further, it noted Plaintiff's ability to remember or carry out detailed instructions only moderately limited. R. 82. As such, based on the documented findings, DDS determined that Plaintiff was not disabled. R. 85.

Upon reconsideration, Plaintiff submitted additional medical evidence and described increased pain. The DDS noted that, despite these new reports, Plaintiff did not have any additional limitations. R. 94. DDS confirmed Plaintiff's exertional limitations and mental impairments. Specifically, the report concluded that Plaintiff did not have severe limitations in the area of concentration, pace, understanding or memory. The report also confirmed that Plaintiff was not significantly limited in her ability to make simple work-related decisions. As such, the DDS upheld its earlier determination that Plaintiff was not disabled.

### C. ALJ Hearing and Decision

*1. Plaintiff's Testimony*

At the hearing before the ALJ, Plaintiff alleged that she was unable to work because of fatigue and pain. The ALJ noted that she suffered from obesity, asthma, a learning disorder, a major depressive disorder, and a generalized anxiety disorder. R. 12.

In her testimony, Plaintiff detailed her struggles with anxiety and other emotional problems. R. 46. At one point, she attempted to leave the hearing because of nervousness. R.

47. She further explained that she experiences daily pain, tiredness, panic attacks, and shortness of breath. She testified that she struggled to pick up a gallon of milk or sit for more than an hour at a time. R. 55, 56. She also discussed various other difficulties related to obesity. R. 54. Specifically, while she performs household chores, she often cannot complete them alone. In addition, she stated that her sister or oldest daughter often join her when she leaves the home. R. 52.

### 2. *The Vocational Expert's Testimony*

ALJ asked the vocational expert whether an individual with Plaintiff's educational background, exertional limitations, and mental capacity could perform any occupation in the national economy. R. 61. Specifically, the ALJ noted Plaintiff's lack of past relevant work, age, and GED. He added that the individual could understand, remember, and carry out simple instructions. He also explained that, from an exertional standpoint, the individual could engage in light exertion. The vocational expert identified such occupations as a linen grader and an assembler of plastic hospital equipment. R. 62. The vocational expert affirmed these occupations when the judge added two additional limitations: avoiding concentrated exposure to certain fumes and odors and occasionally interacting with other individuals. R. 63.

During cross examination, Plaintiff's lawyer expanded upon the limitation of occasionally interacting with other individuals. Specifically, the lawyer stated,

> With regards to the Judge's last hypothetical, if we were to assume that being able to associate with a supervisor occasionally also meant that we're dealing with an individual who on occasion during the workday could not associate with a supervisor – when the supervisor wanted to meet with them, they could not deal

> with a supervisor at that moment, would it interfere with that person's ability to
>
> perform any of the jobs you indicated?

The vocational expert responded, "Yes, because there's always supervision. . . its going to be a problem keeping a job." R. 64.

Plaintiff's lawyer then considered the listed DOT aptitudes for the noted jobs using the program *OccuBrowse*. The aptitudes for the jobs required a general learning ability of Level Four. R. 65. The Vocational Expert then testified that a Level Four meant that a person had an IQ in the 11th to 33rd percentile. R. 66. Appearing to define the DOT occupations based on *OccuBrowse*'s listed aptitudes, the VE then stated that a person with a learning ability below the 11th percentile – which represents someone in the Plaintiff's range – would be "below average" and therefore "below what is required" of the two jobs the VE indicated to the Judge. R. 67.

### 3. The ALJ's Determination

The ALJ carried out the five-step process and found the following. At step one, the ALJ found that the Plaintiff had not engaged in substantial gainful activity since her alleged disability onset date. R. 12. At step two, the ALJ found that the Plaintiff had "severe" impairments including obesity, asthma, learning disorder, major depressive disorder, and generalized anxiety disorder impairments. R. 12. At step three, the ALJ concluded that Plaintiff's impairments did not meet or medically equal the criteria of any of the Listings. R. 13. The ALJ noted that in activities of daily living, Plaintiff has only mild restriction. Specifically, the ALJ noted that she cares for herself and for her three children, prepares simple meals, drives, and pays bills. R. 13. The ALJ also noted that, in social functioning, Plaintiff has only moderate difficulties. While she complains of panic attacks, she has friends, assists at her children's school, and is a member of the school's parent-teacher association. The ALJ mentioned these facets of Plaintiff's life

while similarly noting the moderate difficulties associated with her concentration, persistence, or pace.

Then, the ALJ concluded that the Plaintiff has the residual functional capacity (RFC) to perform light work as defined in 20 CFR 416.967(b) except that she must avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. R. 14. The ALJ noted that Plaintiff is able to understand, remember, and carry out simple instructions and can occasionally interact with coworkers, supervisors, and the general public.

While acknowledging her subjective complaints of pain and difficulty, the ALJ found such statements not entirely consistent with the medical evidence and other evidence in the record. R. 15. The ALJ noted medical tests that found Plaintiff to have a normal respiratory effort, normal bilateral strength and range of motion, and the ability to walk and heel and toe walk. R. 16. The ALJ further noted evidence that Plaintiff has not been entirely compliant in taking prescribed medications following doctor's advice. At step four, the ALJ determined that Plaintiff has no past relevant work. R. 19. Finally, at step five, the ALJ considered the claimant's age, education, work experience, and residual functional capacity and found that there are jobs that exist in the national economy that the claimant can perform. R. 19. The ALJ thus concluded that the Plaintiff was not disabled, as defined by the Social Security Act, since the date of the application.

## II. STANDARD OF REVIEW

When reviewing the Commissioner's final decision, this Court is limited to determining whether the decision was supported by substantial evidence, after reviewing the administrative record as a whole. *Zirnsak v. Colvin*, 777 F.3d 607, 610 (3d Cir. 2014) (citing 42 U.S.C. §

405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir. 2000). Substantial evidence is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence." *See, e.g., Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). Courts may not set aside the Commissioner's decision if it is supported by substantial evidence, even if this court "would have decided the factual inquiry differently." *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001).

When reviewing a matter of this type, this Court must be wary of treating the determination of substantial evidence as a "self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). This Court must set aside the Commissioner's decision if it did not take the entire record into account or failed to resolve an evidentiary conflict. *See Schonewolf v. Callahan*, 927 F. Supp. 277, 284–85 (D.N.J. 1997) (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)). Evidence is not substantial if "it really constitutes not evidence but mere conclusion," or if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114). A district court's review of a final determination is a "qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham." *Kent*, 710 F.2d at 114.

### III. DISCUSSION

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."

42 U.S.C. § 423(d)(1)(A). The ALJ used the established five-step evaluation process to determine whether Plaintiff was disabled. *See* 20 C.F.R. § 404.1520.

For the first four steps of the evaluation process, the claimant has the burden of establishing her disability by a preponderance of the evidence. *Zirnsak v. Colvin*, 777 F.3d 607, 611–12 (3d Cir. 2014). First, the claimant must show that she was not engaged in "substantial gainful activity" for the relevant time period. 20 C.F.R. § 404.1572. Second, the claimant must demonstrate that she has a "severe medically determinable physical and mental impairment" that lasted for a continuous period of at least twelve months. 20 C.F.R. § 404.1520(a)(4)(ii); 20 C.F.R. § 404.1509. Third, either the claimant shows that her condition was one of the Commissioner's listed impairments, and is therefore disabled and entitled to benefits, or the analysis proceeds to step four. 20 C.F.R. § 404.1420(a)(4)(iii). Fourth, if the condition is not the equivalent to a listed impairment, the claimant must show that he cannot perform his past work, and the ALJ must assess the claimant's residual functional capacity ("RFC"). 20 C.F.R. § 404.1520(a)(4)(iv); 20 C.F.R. § 404. 1520(e).

If the claimant meets her burden, the burden shifts to the Commissioner for the last step. *Zirnsak*, 777 F.3d at 612. At the fifth and last step, the Commissioner must establish that other available work exists that the claimant is capable of performing based on her RFC, age, education, and work experience. 20 C.F.R. § 404.1520 (a)(4)(v). If the claimant can make "an adjustment to other work," she is not disabled. *Id.*

Here, the Plaintiff argues that the decision of the ALJ was not supported by substantial evidence. Specifically, Plaintiff charges that the ALJ's findings as to Plaintiff's residual functional capacity and her ability to perform alternative work activity at Step Five of the sequential evaluation process is not supported by substantial evidence. In making this argument,

Plaintiff contends that the ALJ ignored the testimony of the vocational expert and therefore his decision was contrary to these findings.

### A. Whether the ALJ's determination at step three was supported by substantial evidence

Plaintiff challenges the ALJ's conclusion at step three. Specifically, the ALJ considered and concluded that the requirements of 12.04 or 12.06 of the Listings of Impairments were not met. When considering these "B" criteria, the ALJ found that the Plaintiff had only mild impairment in activities of daily living. The ALJ also found that Plaintiff had only moderate limitations in concentration and social functioning. Taken collectively, Plaintiff argues that the ALJ did not properly consider the evidence on the record, the testimony by the Plaintiff painted a different picture, and the ultimate findings were therefore based on conclusory statements. Plaintiff argues instead that her combined physical and mental impairments indicate marked limitations..

Step three requires the Commissioner to compare medical evidence of the claimant's impairment(s) to the list of impairments presumptively severe enough to preclude any gainful activity. 20 C.F.R. § 1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). To meet the "B" criteria for listing 12.04 and/or listing 12.06, the mental impairment must result in at least two of the following: marked restriction of activities of daily; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. *Id.* A marked limitation means more than moderate, but less than extreme. 20 C.F.R. pt.404, subpt. P,

app. 1, §12.00C.  In determining whether a Plaintiff satisfies "B" criteria, the Court must provide some basis for its conclusion.  This Circuit has relatedly rejected conclusory statements without mention of any specific impairments.  *See Cotter v. Harris,* 642 F.2d 700, 704–05 (3d Cir.1981).

Here, the ALJ provided a reasonable basis for concluding that Plaintiff has not satisfied "B" criteria.  First, the ALJ opinion discussed Plaintiff's *mild* restrictions in terms of daily living.  Specifically, the ALJ noted that the Plaintiff has no problem with personal care and has cared for her three children.  R. 13.  The ALJ stated that she can drive and pay bills.  R. 13.  Second, the ALJ provided a reasonable basis for concluding that Plaintiff had only *moderate* difficulties with social functioning.  R. 14.  Specifically, the ALJ found that while she complains of panic attacks, she has assisted at her children's school and served as a member of the PTA.  R. 14.  Third, the ALJ reasonably determined that Plaintiff had *moderate* difficulties with respect to concentration, persistence or pace.  R. 14.  Specifically, the ALJ noted that on exam she had good thinking and memory.  Finally, the ALJ found that Plaintiff has experienced no episodes of decompensation.

**B.  Whether the ALJ's RFC determination is supported by substantial evidence**

Plaintiff next argues that the ALJ's finding as to the RFC is inconsistent with any reasonable view of the medical evidence.  Specifically, the Plaintiff charges that the ALJ mischaracterized reports of her mental providers as well as the opinions of the consulting psychologist, Dr. Mintzer.  Plaintiff also criticizes the ALJ's treatment of Dr. Alan Gordon, who classified Plaintiff's IQ as borderline three years before the SSI application.  R. 324.  Plaintiff also attacks the ALJ's finding that Plaintiff had no greater than a mild impairment in activities of daily living and submits photographs that suggest a marked impairment.  R. 264–66.

   *1.  The ALJ's RFC determination*

Between steps three and four, the ALJ is required to assess *all* of the claimant's impairments—even ones that are not "severe"—in combination, when making the RFC determination. *See* 20 C.F.R. § 404.1545(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' as explained in §§ 404.1520(c), 404.1521, and 404.1523, when we assess your residual functional capacity."). SSR 96–8p is clear about what the ALJ must consider:

> In assessing RFC, the adjudicator *must* consider limitations and restrictions imposed by *all* of an individual's impairments, even those that are not "severe." While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim. For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a "not severe" impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do.

SSR 96–8p (emphasis added); *see also Soboleski v. Comm'r of Soc. Sec.*, 2015 WL 6175904, at *2 (D.N.J. Oct. 20, 2015) (explaining that a finding of non-severity "does not obviate the need for a separate analysis of how Plaintiff's impairment affects her RFC"). The ALJ must therefore consider all relevant evidence when determining an individual's RFC.

This Circuit provides additional guidance on how the ALJ may weigh medical evidence. "Although treating and examining physician opinions often deserve more weight than the opinions of doctors who review records," *id.*, the law "is clear ... that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity." *Brown v. Astrue*, 649 F.3d 193, 197 n.2 (3d Cir. 2011). "Where inconsistency in evidence exists, the ALJ retains significant discretion in deciding whom to credit." *Ganges v. Commisioner of Social Sec.*, No. 17-cv-1982, 2018 WL 5342717, at *11 (D.N.J. Oct. 29, 2018) (citing *Plummer v. Apfel*, 186 F.3d

422, 429 (3d Cir. 1999)). However, the ALJ "cannot reject evidence for no reason or for the wrong reason." *Plummer*, 186 F.3d at 429 (quoting *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993)).

Here, the ALJ properly considered all relevant evidence when determining the Plaintiff's RFC. The ALJ thoroughly considered medical evidence, treating and examining notes, and state agency medical opinions. This also includes Plaintiff's testimony. The ALJ opinion discusses, at length, Plaintiff's asthma, obesity, depression, anxiety, and learning disorder. The opinion considers the various treatments she received at New Point Behavioral Health. The ALJ notes specific areas where Plaintiff's abilities reveal that her impairments do not reach the necessary level to indicate she is disabled under the Social Security Act. For example, the ALJ notes how various medical opinions predate the Plaintiff's taking of medication or regular therapy sessions. Furthermore, the ALJ notes areas within several medical opinions which appear to undercut findings of severe limitations. R. 336. In contrast, the ALJ discusses why he places additional weight in the expert opinions of the DDS psychologists. Not only did he find them to be objective, balanced, and consistent with the medical evidence as a whole, but he noted that these opinions adequately considered Plaintiff's medical treatment during the 2013 to 2016 period. Finally, the ALJ pays careful attention to the many ways that Plaintiff engages in daily activities: she drives, cooks, cleans, participates in her children's school activities, and shops.

2. *The ALJ's weighing of the medical evidence*

The Plaintiff does not contest the RFC by indicating to this Court an area in the record that establishes she had a debilitating mental impairment that the ALJ failed to consider. Instead,

Plaintiff charges that the ALJ should have given Dr. Alan Gordon's report additional weight. This argument is unpersuasive.

Dr. Gordon examined the Plaintiff in 2009, three years before the application for SSI benefits. In that exam, he performed a battery of tests that placed Plaintiff in the sixth-eighth grade level for basic reading and arithmetic skills. In addition, Dr. Gordon found that Plaintiff had a full-scale IQ of 77, which is borderline. R. 369. Finally, in the recommendation, Dr. Gordon described Plaintiff as a candidate for psychotherapy. He noted that Plaintiff is capable of success but should work through therapy before attempting to work. R. 375. Importantly, this report predated Plaintiff's application for SSI benefits. As such, the evaluation failed to consider Plaintiff's medications and treatment within the window of her SSI application. Thus, Dr. Gordon's report does not include Plaintiff's taking of Zoloft, which began in April 2015. R. 403. The report similarly does not consider Plaintiff's participation in therapy and psychological treatment occurring from 2013 onward.

Contrary to Plaintiff's assertion, the ALJ properly gave Dr. Gordon's testimony less probative weight. This Circuit is clear in holding that an ALJ "need only include in the RFC those limitations which he finds to be credible." *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 147 (3d Cir. 2007). Thus, if an ALJ perceives a medical report to be inconsistent he may give limited weight. *See Scouten v. Comm'r Soc. Sec.*, 722 F. App'x 288, 290 (3d Cir. 2018) (holding that "the ALJ was entitled to give [the Dr's] opinion limited weight" because it "was inconsistent" with other medical records). The Third Circuit has further held that "an ALJ may reject [IQ] scores that are inconsistent with the record." *Markle v. Barnhart*, 324 F.3d 182, 187 (3d Cir. 2003). *See* also *Clark v. Apfel,* 141 F.3d 1253, 1255 (8th Cir.1998); *Popp v. Heckler,* 779 F.2d 1497, 1499 (11th Cir.1986).

Here, the ALJ's credibility determination was reasonable because it was inconsistent with medical evidence within the application period. For example, the ALJ noted that, despite a borderline IQ, the record supported a finding that she lacked severe social or mental limitations. The ALJ specifically noted that following Dr. Gordon's report she received a GED. R. 16. The ALJ also noted Plaintiff's ability to engage in daily activities from 2013 onward. Contrary to the ALJ in *Morales*, the ALJ here described Plaintiff's ability to do household tasks, drive, and cook. 324 F.3d at 182. The Eighth Circuit Court of Appeals similarly held that the ALJ properly rejected the validity of the claimant's full-scale IQ of 67 where she had a driver's license and cared for a child. *Clark v. Apfel*, 141 F. 3d. 1253.

While Plaintiff makes a persuasive argument that a cognitive test prior to an application may be relevant to show a medical condition, she fails to consider the broader implications of Dr. Gordon's report. For example, if the ALJ provided greater weight to this medical evaluation, the Court would consider the report in its entirety, not just the IQ determination. Upon considering the whole report, this Court identifies a key fact that the plaintiff omitted, namely that Dr. Gordon recommended that Plaintiff could work after participating in therapy. R. 375. Since Plaintiff now engages in regular therapy, Plaintiff's plea for a greater focus on Dr. Gordon's 2010 report undercuts the broader argument that she is now unable to work.

**C. Whether the ALJ's findings at Step 5 are supported by substantial evidence**

Plaintiff next argues that the ALJ's finding that Plaintiff could engage in alternative work activity lacks a reasonable basis. Plaintiff focuses on the fact that she has never worked at the substantial gainful work activity level and has not in more than fifteen years. While the ALJ acknowledged this fact, he stated that there would be alternative work activity at the substantial

gainful work activity level based on the testimony of the vocational expert, Ms. Rabia Rosen. Ms. Rosen testified that someone with similar RFC as the Plaintiff could engage in work activity as a linen grader, DOT 361.687-010 or an assembler of plastic hospital equipment, DOT 712.687-010. Plaintiff attacks the ALJ for failing to consider certain limitations, such as an inability to respond to supervision or a learning disability, and other issues that Ms. Rosen addressed on the record.

### 1. *The ALJ's interaction with the vocational expert*

At Step Five of the five-step inquiry, an ALJ must rely on the testimony of a vocational expert ("VE") or a learned treatise to meet the burden of establishing that jobs exist in the national economy that a claimant can perform. *Sykes v. Apfel,* 228 F.3d 259, 273 (3d Cir.2000). Testimony of a vocational expert typically includes one or more hypothetical questions posed by the ALJ. *Podedworny v. Harris*, 745 F. 2d 2010, 218 (3d. Cir. 1984). An ALJ may only consider a vocational expert's answer to a question for determining disability "if the question accurately portrays the claimant's individual physical and mental impairments." *Id*. As such, a question that fails to consider an impairment that has a serious effect on the claimant cannot be substantial evidence in the ALJ's determination of disability. *Id*. In order for the hypothetical to be an "accurate [ ] portray [al]," it must reflect all of the claimant's impairments. *Id.* However, "all impairments" means only those that are medically established. *Rutherford v. Barnhart,* 399 F.3d 546, 554 (3d Cir.2005). "Limitations that are medically supported but are also contradicted by other evidence in the record may or may not be found credible." *Id.* And, as explained, credibility determinations are to be made by the ALJ. *See* § 404.1527.

Here, the ALJ properly considered Plaintiff's limitations in questioning the vocational expert about corresponding jobs in the national economy. The hypothetical specified plaintiff's

age, education, work experience, and RFC. This question included her ability to remember, understand, and carry out simple instruction. R. 61. It further considered her physical limitations by adding an ability to engage in only "light exertion." R. 62. In addition, the question considered social limitations, specially describing an individual who "occasionally interacts" with the general public. R. 63. In forming this query, the ALJ considered the Plaintiff's physical and mental impairments. *Podedworny*, 745 F. 2d at 218. The VE considered these limitations and noted two DOT occupations with light SVP2 position and significant number in the national economy, linen grader and assembler of plastic hospital equipment.

2. *Plaintiff's interaction with the VE*

Again, Plaintiff does not provide any evidence to suggest that the hypothetical was based on a flawed analysis of Plaintiff's RFC. Instead, Plaintiff's counsel takes issue with the VE's response to his questions at the ALJ hearing. There, the Plaintiff's counsel explained that both listed jobs had aptitude levels of four by the DOT. The VE then read the definition of level four aptitude based on a third-party program, *OccuBrowse*. In doing so, the VE agreed that an aptitude of four corresponded with one having an IQ ranging from the eleventh to thirtieth percentile. The VE then admitted that a person with an IQ below this would not be able to work in the two listed jobs. Plaintiff's counsel therefore argues that the ALJ failed to weigh the VE testimony at Step Five because this answer is inconsistent with the ALJ's prior hypothetical.

Plaintiff's arguments regarding the VE's testimony fails for several reasons. First, the law focuses on the ALJ's response to the Judge's hypothetical, not the Plaintiff's lawyer reframing of the hypothetical. *See Craigie v. Bowen*, 835F.2d 56, 57-58 (3d Cir. 1987) (stating that an ALJ is not required to credit VE testimony in response to a hypothetical question based on a Plaintiff's subjective complaints). This Court further notes that if the law permitted lawyers

to reconfigure the hypothetical, litigation would never end as to whether every limitation was defined for the VE. Second, the ALJ does not have to prefer a definition from the VE or DOT in the event of a conflict. Furthermore, the Plaintiff's counsel appears to have used definitions for aptitude level outside the DOT, namely the service "OccuBrowse." Third, Plaintiff's counsel is essentially charging that an IQ score of 77 *per se* disqualifies the Plaintiff from any jobs specified by the vocational expert. The Third Circuit expressly rejected this argument in *Burns v. Barnhart*, 312 F.3d 113 (3d Cir. 2002). There, the Court wrote,

> Burns makes an additional argument that his aptitude level *per se* disqualifies him from any of the jobs specified by the vocational expert based on the aptitude levels for those jobs set forth in the DOT. He asserts that his IQ score of 75 on the WAIS–R test places his aptitude level in the lowest ten-percent of the population, and that, according to the DOT, the jobs for which he was found qualified require an aptitude level above the lowest ten-percent of the population. Because we find no such levels incorporated into the DOT, we reject Burns' argument. While aptitudes are discussed in various occupational handbooks, *see, e.g.*, J. Michael Farr, et al., *Guide for Occupational Exploration* (3d ed.2001), aptitude levels are not in the DOT or any other source of which the Social Security Administration has taken administrative notice. Therefore, the DOT and testimony of the vocational expert was not necessarily inconsistent in this regard, so the duty on the part of the ALJ to inquire into conflicts did not arise.

This Court similarly finds Plaintiff's challenges to the VE's responses to be unavailing.

**CONCLUSION**

For the reasons discussed above, this Court **AFFIRMS** the decision of the Appeals Court.

Dated:   12/3/2018                                                                                                         s/ Robert B. Kugler

                                                                                                                            ROBERT B. KUGLER

                                                                                                                            United States District Judge